

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MOLLY GARRISON, individually and as the
personal representative of the ESTATE OF RALPH
GARRISON, deceased,

        Plaintiff,

        -vs-

CHIEF JOSEPH POLISAR, LIEUTENANT
RUBEN DAVALOS, LIEUTENANT J.R.
DEBUCK, LIEUTENANT JUDD SCHAFFER,
SERGEANT KEVIN MCCABE, ACTING
SERGEANT STEVE RODRIGUEZ, OFFICER
HOWARD NEAL TERRY, OFFICER CHARLES
LOPEZ, CHRISTINA BACA, MARY PATRICK,
MARY MARQUEZ, GILBERT DURAN,
SHERIFF JOSEPH BOWDICH, SERGEANT
KENNETH BOZELL, CAPTAIN DAVID
LINTHICUM, CAPTAIN LARRY STEBLETON,
DEPUTY ERIK LITTLE, DEPUTY JAMES
MONTEITH, DEPUTY JAMES GONZALES,
DEPUTY PATRICK LUCERO, DEPUTY
FERMIN ORTEGA, DEPUTY GREG REESE,
DEPUTY DAVID ARCHIBEQUE, and DEPUTY
VAN ELDREDGE in their individual and official
capacities,

        Defendants.

No. CIV 96-1801 LH/DJS

**FILED**
UNITED STATES DISTRICT COURT
ALBUQUERQUE NEW MEXICO

MAR 1 2 1999

CLERK

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on City Defendants' Motion for Partial Summary

Judgment No. III: Qualified Immunity for Officer Terry Against Fourth Amendment Excessive Force

Claim (City's Motion No. III) (Docket No. 30), filed July 17, 1997; Bernalillo County Defendants'

Motion for Summary Judgment on Plaintiff's Civil Rights Claims (County's Motion) (Docket No.

69), filed October 24, 1997; City Defendants' Motion for Partial Summary Judgment No. VI: Supervisory Liability Claim Against Chief Polisar, Lt. DeBuck, and Lt. Schaffer, Assault and Battery Claim Against Officer Terry, § 1983 Conspiracy Claim, and § 1983 and State Tort Claims Against the APD Radio Dispatchers and 911 Operators (City's Motion No. VI) (Docket No. 74), filed November 5, 1997; City Defendants' Motion for Partial Summary Judgment No. VII: Qualified Immunity for Defendant Officers Against Fourth Amendment "Unlawful Search and Seizure" and False Imprisonment Claims (City's Motion No. VII) (Docket No. 85), filed January 8, 1998; and County Defendants' Supplemental Motion for Summary Judgment on Plaintiffs' [sic] Civil Rights Claims (County's Supplemental Motion) (Docket No. 108), filed August 5, 1998. The Court, having considered the pleadings submitted by the parties, including cross-referenced statements of undisputed material facts and affidavits submitted with previously ruled upon motions and supplemental pleadings, the oral argument of counsel at hearing, and the applicable law, and otherwise being fully advised, finds that City's Motion No. III is well taken and will be **granted**, County's Motion is  well taken in part and will be **granted in part**, City's Motion No. VI is well taken in part and will be **granted in part**, City's Motion No. VII is well taken and will be **granted**, and County's Supplemental Motion is well taken and will be **granted**.

**FACTUAL BACKGROUND**

This suit stems from a most unfortunate event, the shooting of sixty-nine year old Ralph Garrison by members of the Albuquerque Police Department (APD) and the Bernalillo County Sheriff's Office (BCSO) at his home on December 16, 1996, while they were executing a search warrant on Mr. Garrison's adjacent rental property. Mr. Garrison subsequently died of his wounds. The relevant facts in this case have been extensively developed through affidavits and depositions.

2

In early December 1996, an APD investigation turned up evidence of a criminal conspiracy involving stolen and counterfeit checks, counterfeit United States currency, and other felony white-collar activity, the proceeds of which were used in part by the conspirators to supply their methamphetamine drug habits. A coconspirator told investigators that equipment used to make counterfeit documents was kept at a residence located at 2615 Quincy N.E. Further investigation revealed that this property was rented by certain other coconspirators from Ralph Garrison, who resided at 2619 Quincy N.E. There was no evidence linking Mr. Garrison to the criminal activities.

A search warrant for 2615 Quincy was issued on December 13, 1996. For a variety of reasons, including the determination that detectives in the White Collar Crimes Unit were neither adequately trained nor suitably equipped to execute the warrant against the potentially armed and violent suspects expected to be present in the two "fortified"[1] structures on the property, APD's Special Weapons and Tactics (SWAT) Unit agreed to plan and carry out the operation. Execution of the warrant was tentatively scheduled for December 16, 1996, at 9:00 a.m. After reviewing relevant information regarding the suspects and surveying the subject location and adjacent neighborhood several times, including from the air in a United States Customs Service helicopter, an APD SWAT officer determined that, due to pedestrian and vehicular traffic, 6:00 a.m. would be the safest time of day to serve the warrant. He also concluded that more SWAT officers than were available to the APD SWAT Unit would be needed to safely and effectively enter the buildings on the property. Thus, the assistance of the BCSO SWAT Team was secured. After further joint planning by officers of both SWAT units, the final plan for execution of the warrant was approved:

---

[1] The property was protected by a tall fence with a locking gate, wrought iron bars on the front door and windows of the front structure, a wrought iron door on the rear structure, and a Rottweiler dog in the backyard.

The search warrant was to be served at 6:00 a.m., with the APD SWAT Unit entering the main residence and the BCSO SWAT Team securing the backyard and entering the rear structure.

Members of the APD SWAT Unit, BCSO SWAT Team, APD White Collar Crimes Unit, APD Air Support Unit, and an APD Tactical Emergency Medical Support (TEMS) officer met at 3:00 a.m. on December 16, 1996, to review plans for execution of the search warrant. APD Air Support officers showed a previously videotaped forward looking infrared[2] (FLIR) aerial view of 2615 Quincy and the surrounding area. They also announced that a United States Customs Service helicopter, equipped with a FLIR video camera and a Night Sun spotlight,[3] would hover at approximately 300 feet while the warrant was being executed and illuminate the property and surrounding area after the SWAT officers made their initial entry. Information concerning the criminal case, search warrant, and suspects was also provided. No information was given about Mr. Garrison or any other neighbor, however, as surveillance had revealed no reason to conclude that they posed a threat to the officers' safety. Accordingly, the officers were instructed to treat the threat posed by neighbors as "unknown." Diagrams of the staging area and subject property and RAP sheets and photos of the suspects were passed out. Participants were briefed on the plan and assigned their specific responsibilities, which they then rehearsed. The APD and BCSO SWAT units then conducted individual team briefings covering their assigned duties.

The duty sergeant at the North Area Command was informed shortly after 4:00 a.m. that a search warrant would be executed at 2615 Quincy N.E. at approximately 6:01 a.m. that morning.

---

[2]    A FLIR camera allows observation of people and objects on the ground in the absence of an ambient light source.

[3]    At an altitude of about 300 feet, the Night Sun produces light sufficient for a person on the ground to read a newspaper at night.

4

Also, the Albuquerque Fire Department (AFD)was notified and asked to have a rescue unit standing by. At 4:20 a.m., APD radio dispatch (Valley III) was told of the operation and asked to send an APD Field Investigator to the warrant site sometime after 6:10 a.m.

Shortly after 5:30 a.m., the participants met at the staging area, a parking lot located closer to the Quincy address, where they were joined by a United States Secret Service Special Agent. The APD SWAT Unit officers wore black Nomex fatigue uniforms, Nomex balaclavas, and Nomex flight gloves. A 3 ½ by 4 ½ inch APD shoulder patch was sewn on the left arm of the fatigues and a 3 ½ by 4 ½ SWAT Unit patch on the right sleeve. Both patches were centered about one inch below the shoulder. Over the tactical uniforms the officers wore bullet-resistant body armor, with a cloth silver or gold APD badge sewn on the left breast area. Additionally, all wore equipment vests, bullet-resistant helmets, and safety goggles or glasses. They also carried specialized firearms, including hand guns, shot guns, and semi-automatic rifles. The BCSO SWAT Team deputies were similarly attired and equipped.

While waiting in the parking lot, the U.S. Customs pilot informed the participants that the lights were on in the main residence at 2615 Quincy. Several officers who conducted a drive-by confirmed this information and stated that there was activity inside the residence. At approximately 6:00 a.m. the authorities proceeded to the warrant location in several APD vehicles, including a raid truck, "pull" vehicle, SWAT Unit equipment truck, and two K-9 vehicles, the BCSO SWAT Team raid truck and CNT truck, and an unmarked car.

On arrival at approximately 6:03 a.m., a deputy sheriff used the BCSO CNT truck to breach the gate on the south side of 2615 Quincy.[4]  Another officer positioned the "pull" vehicle at the southeast corner of the property, in case it was needed to remove the wrought iron door on the front building.  The raid truck was parked in front of the residence and APD SWAT team officers exited and took their positions.  Officer Bledsoe drove his APD K-9 truck[5] north through the alley on the west side of the property, stopping next to a three foot high cinder block wall topped by a three foot chain link fence directly behind 2619 Quincy.

The APD SWAT Team entered the main residence through the unlocked front door, without using any forced-entry tools or flash diversionary devices.  The building and its occupant were secured in short order and the White Collar Crimes detectives then conducted the search.

As the APD SWAT Unit approached the front building, the BCSO SWAT Team secured the backyard area around the rear structure and provided cover to the entry team.  Deputies Little[6] and Monteith positioned themselves in front of the combination cinder block wall and chain link fence[7] that separated 2615 Quincy from 2619 Quincy.  As the Customs helicopter began to lower its hover to 300 feet, the County SWAT Team announced itself at the wrought iron door of the rear structure.  There being no response, two deputies unsuccessfully attempted entry with a hand-held ram, halligan

---

[4]     The gate's lock was protected by a metal enclosure which prevented breaching tools from quickly and effectively removing the lock.

[5]     The K-9 truck was marked as a police vehicle, with overhead emergency lights, APD badges on the driver and passenger's doors, and "CAUTION POLICE DOG" written in four-inch letters on the side.

[6]     Deputy Little, who had spent several years as a canine officer, carried a black $CO_2$ fire extinguisher to pacify the reported guard dog, but no dog was found on the property.

[7]     Chain link fencing, approximately three feet in height, topped a cinder block wall, which varied in height from about three feet to one foot as it ran from east to west.

6

tool, and pry bar[8] while others loudly shouted, "Sheriff's Department! Search warrant!" Next a

deputy shot two Remington 870 12-gauge, "shok lock," rounds into the lock mechanism, but the

door still remained secure. Finally, the deputy shot two one-ounce, 12-gauge slug rounds into the

lock and the door was opened with the pry bar. After a flash diversionary device was deployed

through the door, the BCSO SWAT Team entered the structure. The helicopter hovered at 300 feet,

illuminating the area with its Night Sun.[9] The time was approximately 6:05 a.m.

    While the BCSO SWAT Team was attempting to enter the rear building, a man, later

identified as Mr. Garrison, walked out of the rear of the house at 2619 Quincy, into the backyard.

Deputy Little shouted standard departmental warnings at him: "Sheriff's Department." "We're

executing a search warrant!" "Go back inside your house!" Mr. Garrison walked toward Deputy

Monteith, saying, "What's going on? That's my property." Mr. Garrison did not appear to

understand and the police continued giving their warnings. As Mr. Garrison looked directly at him,

Deputy Monteith shouted, "Go back in your house! Sheriff's Department! Go back in your house!"

Mr. Garrison, however, continued walking toward Deputy Monteith. Deputy Little repeatedly yelled,

"Sheriff's Department! We're executing a search warrant! Go back inside your house!" He also

shouted, "Police Department! We're executing a search warrant!" At the same time, Officer

Bledsoe,[10] standing next to the K-9 truck in the alley behind the Garrison house, yelled twice, "Police

Department! Go back inside!" Detective (Det.) Maez, also in the alley, shouted "Police

Department! Go back inside!" and turned around so Mr. Garrison could see the word "POLICE"

---

[8]   More than fifteen attempts were made to open the door in this manner.

[9]   The helicopter also recorded the warrant service on its FLIR videotape system.

[10]  APD K-9 Officer Bledsoe wore a tactical uniform similar to that of the APD SWAT Unit.

written in six-inch block letters on the back of his raid jacket.[11] When Mr. Garrison got to within seven to ten yards, Deputy Little again yelled at him to go back inside his house. Mr. Garrison finally stood only about seven feet away from and looked directly at Deputy Monteith, who ordered him to go back inside his house. Mr. Garrison responded, "That's my property," and slowly walked back inside his house. Deputy Monteith then heard Deputy Little say something like, "I hope he doesn't come out with a gun." Deputy Monteith thought this was a possibility and that he should be careful.

This initial encounter with Mr. Garrison lasted approximately one minute. The area was illuminated by the helicopter's Night Sun spotlight[12] and none of the officers shined any flashlights or spotlights at Mr. Garrison.[13] When the helicopter was released,[14] Officer Bledsoe illuminated the area by the rear door of 2619 Quincy with the spotlight on his K-9 Unit vehicle.

---

[11]    Det. Maez's jacket also had a patch on the left shoulder and a badge on the front.

[12]    Lighting conditions were undoubtedly poor, particularly from Mr. Garrison's viewpoint. Based on a subsequent APD reinactment, "only vague silhouettes could be seen in the backyard of 2615 Quincy" from Mr. Garrison's bedroom window and "[t]he same conditions were present at the back doorway. The spotlight from the helicopter made body shapes easier to see but only for brief moments." (Pl's. Resp. County's Motion (Docket No. 71), Ex. E at 9; *see id.* Ex. F at 7 ("It was pretty poorly lit. . . .It was all pretty dark. Everything was done by flashlight. . . . [T]here was some illumination from the US Customs A Star, their helicopter. But it wasn't much . . . .").)

[13]    Plaintiff questions this fact by quoting a transcription of the "911" call compiled by Det. Rick Foley on December 19, 1996: "[T]hey *had* flashlights in my face and everything." (*Id.* Ex. G at 2 (emphasis added).) According to the transcription produced by Paul Ginsberg, President of Professional Audio Laboratories, Inc., however, Mr. Garrison said, "They've *got* flashlights on my face and everything . . . ." (Mem. Support City's Motion No. III (Docket No. 31) Ex. A. Attach. 2 at 2 (emphasis added).) Mr. Ginsberg described his qualifications and methodology in detail in his affidavit, which he closed by stating, "To a reasonable degree of certainty, it is my expert opinion that the transcript of Mr. Garrison's 911 call fairly and accurately represents the words spoken and recorded on the Dictaphone logger tape." (*Id.* Ex. A ¶ 24.) Plaintiff provides no other support for her supposition that flashlights were shined in Mr. Garrison's face when he went into his backyard to investigate, and the Court has found none. Rather, the evidence by affidavit and deposition is that none of the officers did so.

[14]    The helicopter was released when execution of the search warrant was completed by entering and securing both buildings at 2615 Quincy.

At approximately 6:05:30 a.m., Mr. Garrison called "911"[15] and told Emergency Operator 90, Gilbert Duran, "It's at 2619 Quincy, NE. They're breaking into my house. A whole bunch of people." The Operator asked Mr. Garrison who was breaking in, how many people there were, and how they were trying to get in. Mr. Garrison responded that he didn't know who they were, but there was "a whole bunch of people out there" and they wouldn't let him go out. He estimated there were three to five people and said that he didn't know exactly "because they've got flashlights and everything out there." He stated that they were using axes, hammers, and "all kinds of things," to break in and declared, "I got a gun. I'm gonna go up there and shoot 'em."

The Operator requested that Mr. Garrison remain on the phone and told him that he was "getting somebody out there." The Operator continued questioning Mr. Garrison, asking for a description. Mr. Garrison answered, "They've got flashlights on my face and everything . . . . I'm gonna get my gun." The Operator persisted, asking, "Do you know who they are?" Mr. Garrison replied, "2619. I don't even know nobody or nothin'. Please. Please. I'm gonna go out there, please, thank you. My name is Ralph Garrison." The Operator then said, "Okay, just stay on the phone with me, okay?," to which Mr. Garrison responded, "Okay, I can't, I gotta go see what's happening out there." About twenty seconds later, the Operator told Mr. Garrison, "Okay, just stay on the phone sir. I'm getting somebody out there. Can you see what they're doing?" Mr. Garrison answered, "They're breaking in with axes and [unintelligible]. Please hurry up. Please hurry up. They got flashlights and cars and trucks and all kinds of stuff back there. Please, please hurry up. I'm gonna go out there now. Thank you." The Operator then inquired whether Mr. Garrison could take the phone with him and when Mr. Garrison answered, "Yes," asked him to do so. Mr. Garrison

---

[15] The quoted language is from the transcription produced by Paul Ginsberg. (*Id.* Ex. A, Attach. 2.)

then stated, "They got the lights and everything in my face. . . . Oh yes, I can't see, I can't see, I can

barely see nothing what's going on. . . . . I got my gun. I'll shoot the sons of bitches."

At 6:08:22 a.m., an unknown officer is heard saying, "Drop the gun." Another officer

follows immediately with, "Put that down." Shots were fired at 6:08:24 and white noise ensued.

When deputies reached Mr. Garrison immediately following the shooting, he was lying on the floor

inside the glass rear storm door. A fully loaded and cocked .22 caliber nine-shot High Standard

brand revolver lay near his feet.

APD SWAT Unit Officer Neal Terry participated in the entry of the main residence at 2615

Quincy. Once that structure was secured, he proceeded to clear the side yard, looking for the

Rottweiler, and then, at approximately 6:06 a.m., moved to the backyard to determine if the BCSO

SWAT Team required assistance. They had already entered the rear structure, so Officer Terry

joined Deputies Little and Monteith at the fence.[16] They were directing their attention toward the

rear door of 2619 Quincy, which was illuminated by the K-9 Unit vehicle's spotlight, and was about

thirty-five feet away. After discussing the BCSO SWAT Team's entry into the rear structure, Deputy

Little described the initial encounter with Mr. Garrison and told Officer Terry that the deputies were

providing cover for the BCSO SWAT Team and the White Collar Crimes Unit from any potential

threat posed by Mr. Garrison or any other hostile persons who were inside 2619 Quincy. Deputy

Little also said something to the effect, "Watch this guy come out with a gun now."

As the conversation continued, Deputy Monteith yelled, "Drop the gun," and then, "Put it

down." Mr. Garrison was standing behind the glass storm door of his residence. He moved into the

---

[16]   Other officers in the area at this time included Det. Lucero, leaving the rear structure for the main
residence, Deputy Eldredge, picking up casings outside the door of the rear structure, Acting Lieutenant (A/Lt.) Bozell,
standing a few feet away from Deputy Eldredge and about three feet from Deputy Monteith, and Sergeant Simonson
and Deputy Lucero, standing by the BCSO CNT truck by the breached entry gate on the south side of 2615 Quincy.

doorway, holding what appeared to be a single action, Colt pattern semi-automatic pistol in his right hand and another object in his left hand.[17] Because Deputy Little was standing between him and the doorway at 2619 Quincy, Officer Terry moved to the right, raised his AR-15 rifle, and trained it on Mr. Garrison.

As Mr. Garrison began opening the storm door with his left hand, he raised the pistol to eye level and pointed it in the direction of Deputy Monteith and the other officers located in that direction. When Det. Lucero, who was standing behind Deputy Monteith, saw that the muzzle of the gun was pointed directly at him, he moved for the cover of the rear building and began to draw his weapon. A/Lt. Bozell and Deputy Eldredge also took cover. Officer Terry, in response to a perceived immediate threat of deadly assault against his fellow officers, fired one round at Mr. Garrison. Seeing Mr. Garrison still standing with the gun raised in his hand, Officer Terry fired a second shot. Deputies Little and Monteith, perceiving similar threats to themselves and the other officers, also fired shots at Mr. Garrison.

After Mr. Garrison fell from view, Officer Lopez and several deputies[18] entered the backyard of 2619 Quincy and approached the rear door of the residence. Deputies Little and Eldredge reached the back door first and found Mr. Garrison conscious and lying on the floor with the revolver near

---

[17]    This was later identified as a telephone.

[18]    Officer Terry remained at his position at 2615 Quincy and never entered the Garrison property. All of the Sheriff's Department personnel present, except Deputy Fermin Ortega, entered the Garrison residence at some point following the shooting.

his feet. As Deputy Little opened the storm door, an aggressive dog stepped over Mr. Garrison toward the officers. Deputy Little shot the Chow.[19]

Deputies Reese and Archibeque remained with Mr. Garrison, who was lying on his back, moving,[20] apparently making some attempt to sit up. When advised by Deputy Reese that Mr. Garrison was moving, Deputy Gonzales told Deputy Reese to handcuff him for safety reasons.[21] Deputy Archibeque proceeded to handcuff Mr. Garrison, while Deputy Reese covered him with his rifle. Mr. Garrison had been shot in the torso and right wrist. Part of his wrist was missing; there was a "U" shaped wound about halfway into the wrist. Deputy Archibeque applied a cuff to Mr. Garrison's uninjured wrist first, rolled him on his side and then to his stomach, and placed the other cuff on "as gently" as he could to the injured wrist. Mr. Garrison was handcuffed for a few minutes. Once the sweep was completed, Officer Lopez requested medical assistance for Mr. Garrison. APD TEMS Officer Madrid responded and administered basic life support to Mr. Garrison until the house was secured and on-the-scene AFD paramedics could begin their treatment. Officer Madrid assisted in transporting Mr. Garrison to a hospital.

---

[19] Officer Little recognized that the Chow was about to attack and believed it to be a threat to the officers' safety. They could not safely enter and clear the house while the dog was unrestrained and it also prevented medical personnel from entering to assist Mr. Garrison. Deputies could not use chemical mace against the Chow in the confined area of the work room where Mr. Garrison lay without contaminating themselves and medical personnel.

[20] A/Lt. Bozell and Deputy Gonzales stated at their depositions that they did not see Mr. Garrison move as they passed by him into the house. Neither of them, however, stayed with Mr. Garrison, as did Deputies Reese and Archibeque. Both Deputy Reese and Deputy Archibeque testified that Mr. Garrison was moving while they guarded him. It was on being informed of this fact that Deputy Gonzales ordered them to handcuff Mr. Garrison. The Court therefore does not find any genuine issue of material fact as to the issue of whether Mr. Garrison was moving.

[21] At this time, Deputy Gonzales, who was involved in the protective sweep of the house, was not aware of the severity of Mr. Garrison's injuries.

In the meantime, Officer Lopez and other deputies conducted a protective sweep of the house, looking for other suspects.[22] Mrs. Molly Garrison was the only other person the officers found.[23] Deputy Eldredge encountered Mrs. Garrison, in her night clothes, walking with her walker toward the bathroom adjacent to her bedroom. He twice asked Mrs. Garrison to stop and not go to the bathroom because he needed to search it.[24] Mrs. Garrison did not wait, but went into the bathroom. Deputy Eldredge then told her not to close the door and did not allow her to do so. He maintained continuous eye contact with her while she remained in the bathroom. Officer Little passed through the bedroom at that time and observed that Mrs. Garrison was sitting on the toilet and that the door was open. After Mrs. Garrison left the bathroom, Deputy Lucero went in and checked to ensure there wasn't anybody else present. He also looked for any weapons, including inside the medicine cabinet. Mrs. Garrison then went back into the bathroom and was allowed to close the door.

As she walked back to her bed from the bathroom Mrs. Garrison saw that deputies were moving her furniture in the living room. Although deputies asked her to wait on the couch in the

---

[22]    None of the suspected dangerous individuals were found during the execution of the search warrant at 2615 Quincy. The only person present when the warrant was executed was the woman who had originally informed police that counterfeiting equipment was kept at that location. She was arrested and told officers that two of the suspects had left minutes before the arrival of the APD and BCSO SWAT teams. Thus, the officers believed that those suspects or other unknown assailants could be at 2619 Quincy.

[23]    Mrs. Garrison later recounted that on the morning of December 16, she was awakened by banging and woke her husband by calling to him in the next room. Because of all the lights, she told him, "Look at the house is [sic] on fire." Mr. Garrison got up and went toward the kitchen to get the portable phone. He was gone for "[m]aybe a few minutes, and that's all," and Mrs. Garrison could not see him while he was gone. When he returned he went into his bedroom and she heard him talking on the phone. He then was going out again and when Mrs. Garrison followed him, he told her to go back to her room, which she did. She returned to her bed, from which she could not observe the kitchen or the back door, and she never saw her husband again.

[24]    Local law enforcement officers have been trained not to let people go into bathrooms or other rooms and close the door before the room has been secured by authorities. This policy apparently stems from the shooting of an APD officer several years before this incident. The officer allowed a male subject to go into the bathroom. The subject subsequently came out of the bathroom with a gun and shot the officer.

13

living room, she chose and was allowed to remain in her bed. Deputies also searched her room and closet, removing everything from her drawers. Although she asked the deputies who they were, what they were looking for, and what was going on, they did not tell her anything. Once the area was secured, however, Deputies Eldredge and Lucero removed their balaclavas, to improve their communication with her and in an attempt to put her more at ease.

Mrs. Garrison appeared to the officers to be in frail condition and in need of assistance in caring for herself.[25] As all personnel were needed to secure the crime scene and investigate the shooting, Officer Lopez and A/Sgt. Rodriguez agreed that a relative should be contacted. Mrs. Garrison's son, Benny Garrison, was called. Deputies Lucero and Eldredge stayed with Mrs. Garrison until he arrived at about 7:00 a.m. A/Sgt. Rodriguez briefly explained to him what had occurred that morning and officers helped take Mrs. Garrison to her son's vehicle.

**PROCEDURAL BACKGROUND**

Mrs. Garrison filed suit on her behalf and as the personal representative of her husband's estate on December 23, 1996. On July 28, 1997, she amended the complaint. She filed her Second Amended Complaint for Civil Rights Violations and State Tort Claims on October 3, 1997, asserting claims for unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments, supervisory and official capacity liability for violation of constitutional rights, conspiracy to violate civil rights under 42 U.S.C. § 1983, wrongful death caused by law enforcement officers' assault and battery, false imprisonment by law enforcement officers, and negligence of law enforcement officers

---

[25] Mr. Garrison provided around-the-clock care for his wife, who was "infirm and could only walk a few steps at a time with a walker." (Second Am. Comp. at ¶ 20.) In her deposition testimony on March 12, 1997, Mrs. Garrison said she was dependent upon her husband twenty-four hours a day as her nurse and housekeeper and to help her walk. She stated that with the aid of her walker she could go to the living room, kitchen, and bathroom, but that she never went as far as the back of the house. Deposition testimony by Mrs. Garrison taken on June 13, 1997, has also been submitted in part to the Court.

14

causing enumerated torts. Over the course of this case, Defendants have filed eleven motions for dismissal or partial summary judgment. On November 14, 1997, the Court heard oral argument on all then pending motions. At that time, City's Motions Nos. III and VI and County's Motion were taken under advisement, in whole or in part, pending further discovery and supplemental briefing. (*See* Order, filed March 31, 1998.) Plaintiff filed her Amended Supplemental Response on March 25, 1998, and Defendants City and County responded on March 31, 1998, and April 2, 1998, respectively. Additionally, the City filed its Motion No. VII on January 8, 1998, and the County its Supplemental Motion on August 5, 1998, both of which address issues related to those in the Motions previously taken under advisement.

## ANALYSIS

### Section 1983 Claims

### 1. Unreasonable Seizure of Mr. Garrison

Plaintiff asserts that Defendants seized Mr. Garrison without probable cause and used excessive force by shooting him and subsequently handcuffing him, in violation of the Fourth and Fourteenth Amendments. Both the City and the County move for summary judgment on the Plaintiff's unreasonable seizure claim on grounds of qualified immunity. (City's Motion Nos. III and VII and County's Motion and Supplemental Motion.) Their arguments will be considered together.

The doctrine of qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "A necessary concomitant to the determination of

15

whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). Thus, once a defendant pleads qualified immunity, the burden shifts to the plaintiff "to show both that the defendant's alleged conduct violated the law and that that law was clearly established when the alleged violation occurred." *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988).

The defense of qualified immunity is, as a practical matter, of limited value in excessive force cases. This is because police use of excessive force is a clearly established violation of constitutional rights. The focus of the substantive inquiry that decides the Fourth Amendment issue, whether the force used was objectively reasonable, is the same inquiry that determines whether qualified immunity is available to a government actor. *Quezada v. County of Bernalillo*, 944 F.2d 710, 718 (10th Cir. 1991). Thus, "the qualified immunity and excessive force analysis do not differ in any significant respect." *Diaz v. Salazar*, 924 F. Supp. 1088, 1093 (D.N.M. 1996).

The Fourth Amendment's protections regarding a "seizure" are triggered "only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)(quoting *Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968) and citing *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989)); *see also County of Sacramento v. Lewis*, 118 S.Ct. 1708, 1715 (1998)("[A] Fourth Amendment seizure [occurs] only when there is a governmental termination of freedom of movement through means intentionally applied.")(quoting *Brower*, 489 U.S. at 596-97). A § 1983 claim of use of excessive force during a seizure is analyzed by determining "whether the officers' actions were objectively reasonable in light of the surrounding facts and circumstances," *Allen v.*

*Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997)(citing *Graham*, 490 U.S. at 397; *Thompson v. City of Lawrence*, 58 F.3d 1511, 1516 (10th Cir. 1995)):

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.

*Diaz*, 924 F. Supp. at 1093 (ellipses in original)(quoting *Graham*, 490 U.S. at 396-97). The inquiry, then, requires the Court to examine "whether the totality of the circumstances justified a particular sort of . . . seizure," giving consideration to factors such as the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the officers or others, and whether the subject is resisting arrest or attempting to avoid arrest. *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985).

The excessive force inquiry includes "not only the officers' actions at the moment that the threat was presented, but also *may* include their actions in the *moments* leading up to the suspect's threat of force." *Allen*, 119 F.3d at 840 (emphasis added). Reasonableness "depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct *during the seizure* unreasonably created the need to use such force." *Id.* (emphasis added)(quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)). Thus, an officer's conduct prior to the suspect's threat of force will be considered by the Court if that conduct is "'*immediately connected*' to the suspect's threat of force." *Id.* (emphasis added)(quoting *Romero v. Board of County Comm'rs*, 60 F.3d 702, 705 n.5 (10th Cir. 1995)); *see also Diaz*, 924 F. Supp. at 1096 ("To the extent pre-seizure conduct is immediately connected, both contemporaneously and causally, to the eventual seizure at issue, that conduct should be examined in determining the objective reasonableness of the force employed to effect the seizure.").

17

## A. Shooting

Defendants maintain that the actual seizure of Mr. Garrison, his being shot by Officer Terry and Deputies Little and Monteith while pointing a gun in their direction, was reasonable and, thus, not a constitutional violation of Mr. Garrison's Fourth Amendment rights. They also contend that in December 1996 the law was not clearly established whether acts immediately connected to the seizure/shooting, those allegedly creating a dangerous situation necessitating the shooting of Mr. Garrison by the police, were relevant in assessing the reasonableness of the officers' actions. *Compare Wilson v. Meeks*, 52 F.3d 1547, 1554 (10th Cir. 1995)(citing *Quezada*, 944 F.2d, at 717), *and Plakas v. Drinski*, 19 F.3d 1143, 1148-49 (7th Cir. 1994), *with Sevier*, 60 F.3d 695, *and Diaz*, 924 F. Supp. 1088. Finally, they argue that even if the preceding acts during the first encounter with Mr. Garrison are considered, Defendants' behavior was lawful.

Plaintiff asserts that Defendants are liable because they generated the necessity to kill Mr. Garrison by recklessly causing him to engage in an assault, that their reckless conduct prior to, but immediately connected with the shooting, created the need to use deadly force against Mr. Garrison. Plaintiff contends that there are genuine issues of material fact as to whether the noise generated by the entry into the rear structure at 2615 Quincy would have caused a reasonable person in Mr. Garrison's position to fear for the safety of his tenants and rental property, causing him to arm himself; whether Defendants knew or recklessly disregarded that Mr. Garrison did not know that they were police officers and that he might, therefore, return with a gun; whether the first encounter was immediately connected to the second; and whether, in light of their knowledge, the officers acted unreasonably in failing to take cover, failing to tell other officers in the yard to take cover, and failing to make another attempt to tell Mr. Garrison who they were.

18

There is no dispute that Mr. Garrison had a gun in his hand as he began opening his rear storm door at approximately 6:08 a.m. on December 16, 1996, and that he aimed his gun in the direction of Deputy Monteith and the other officers in that area. It therefore was reasonable for Officer Terry and Deputies Little and Monteith to believe that their lives and those of their fellow officers were in danger at that moment and to respond by shooting Mr. Garrison. *See Wilson*, 52 F.3d at 1554 ("Any police officer in Officer Meeks' position would reasonably assume his life to be in danger when confronted with a man whose finger was on the trigger of a .357 magnum revolver pointed in his general direction.").

The Fourth Amendment does not require use of the least intrusive means, only reasonable ones. *Wilson*, 52 F.3d at 1553-54; *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994). The standard, then, is whether from an objective viewpoint and taking all factors into consideration, the police react reasonably to a threat. *Wilson*, 52 F.3d at 1553-54; *Melendez-Garcia*, 28 F.3d at 1052. Officer Terry and Deputies Little and Monteith did so. They reasonably feared for their and their colleagues' lives and they reacted reasonably to that threat. The Fourth Amendment does not require more. *See Diaz*, 924 F. Supp. at 1100 ("[P]olice are not . . . constitutionally required to respond to a suspect's threat of deadly force with non-deadly force or the least intrusive amount of force."); *see also United States v. Myers*, 106 F.3d 936, 940 (10th Cir. 1997)(early morning "military-style assault" in execution of search warrant at suspected marijuana growing operation in home with sleeping children, including battering down door and deployment of "flash-bang" device by agents dressed in black uniforms and wielding automatic machine guns, objectively reasonable).

19

Finally, even though Defendants may have had a statutory obligation to again warn that they were police before discharging their weapons, violations of state law and police procedure generally do not give rise to a § 1983 claim. *Romero*, 60 F.3d at 705. Furthermore, mere negligent actions precipitating a confrontation are not actionable under § 1983. *Diaz*, 924 F. Supp. at 1097 (quoting *Sevier*, 60 F. 3d at 699 n.7).

There is no evidence in this case that any Defendant made a deliberate or reckless decision to escalate the encounter with Mr. Garrison into a deadly confrontation.[26] *See id.* Therefore, considering the facts and circumstances not only of the seizure itself, when Mr. Garrison appeared at his rear door, pointed his gun at the officers, and was shot by them, but also of Defendants' acts and omissions previous to the seizure, including their method of entry of the rear structure and what transpired while Mr. Garrison was in his backyard and when he returned to his house, the Court finds that Defendants' actions were objectively reasonable and that they are entitled to qualified immunity as to the unreasonable seizure claim with regard to the shooting.

## B. Handcuffing

Plaintiff also brings an excessive force claim with regard to the handcuffing of Mr. Garrison as he lay on his back several feet away from his weapon, not speaking, bleeding from his torso and missing a large part of his right wrist, and under constant surveillance by enforcement officers. She asserts that handcuffing him was futile and cruel because the gun lay on his right side and his right wrist was clearly and severely incapacitated. Defendants Gonzales, Archibeque, and Reese, however, contend that they are entitled to qualified immunity because the handcuffing was

---

[26]   Even Plaintiff's expert testified at deposition that, "I think that the initial encounter with Mr. Garrison was in fact reasonable and appropriate." (Pl's. Am. Supplemental Resp. Defs.' Mots. Summ. J. (Docket No. 97), Ex. F at 36.)

reasonable under the circumstances. (County Defs.' Reply County's Supp. Motion (Docket No. 110) at 2-5.)

The Tenth Circuit Court of Appeals addressed the issue of handcuffing an injured assailant in *Wilson.* 52 F.3d 1547. There, Officer Meeks twice shot Mr. Wilson, who fell to the ground face down with his gun underneath him. Officer Stock arrived moments later and disarmed Mr. Wilson by placing his foot on the back of Mr. Wilson's knee to prevent him from trying to shoot, holding him by the shoulder, and locating the gun underneath his body. A police lieutenant arrived soon afterward, prior to the arrival of medical help, and ordered Officer Stock to handcuff Mr. Wilson. No medical care or first aid was given until the arrival of fire department emergency medical technicians. When the technician requested that the handcuffs be removed so Mr. Wilson could be turned on his side to facilitate his breathing, the lieutenant, the only officer then present, refused to do so and told the technician to remove them. It took a minute or two find the key to the handcuffs and remove them. The technician then performed CPR, spelled by the lieutenant, but Mr. Wilson died shortly after arriving at the hospital, according to plaintiffs' experts not of the gunshot wounds, but of asphyxiation. Plaintiffs brought a claim for failure to render medical aid and defendants moved for summary judgment based on qualified immunity.

Applying the Eighth Amendment standard of deliberate indifference to the due process rights of pretrial detainees, the court addressed the handcuffing to the extent it prevented Mr. Wilson from helping himself to breathe. Finding that the officers could not be expected to know their actions would exacerbate a medical problem, the court also noted

> the detainee was armed and could have posed a threat to human life. As defendants
> correctly note, the first duty of a police officer is to ensure the safety of the officers
> and the public. Handcuffing is a necessary expedient to this end. Handcuffing an
> armed assailant, even after he has been shot, is not a constitutional violation.

21

*Id.* at 1556.  Thus, the court found no constitutional violation under the Eighth Amendment, specifically commenting, however, that the handcuffing could raise a question of excessive force as it is a forceful seizure, but that question was not at issue.  *Id.* at 1547 n.2.

Plaintiff directs the Court to *Howard v. Dickerson*, 34 F.3d 978 (10th Cir. 1994), a case discussed by the *Wilson* court, and *Palmer v. Sanderson*, 9 F.3d 1433 (9th Cir. 1993), in support of her Fourth Amendment excessive force claim.  The Court finds Plaintiff's cases inapposite, given the very different circumstances involved here.  At the time Mr. Garrison was handcuffed, the situation was very much in flux: Mr. Garrison had only moments before aimed his gun at officers and been shot, and the officers were in the process of conducting a protective sweep of his residence, not knowing who else was present or whether other weapons were available, but believing other dangerous and armed suspects might well be there.  Concern for the safety of the officers and others was immediate and real.  Additionally, there is no evidence that there was any intent on the part of the deputies to cause harm to Mr. Garrison in handcuffing him or that the handcuffing adversely affected Mr. Garrison's condition.  Deputy Archibeque stated that he put the handcuff on Mr. Garrison's injured wrist "as gently as [he] could," and they were removed after "a few minutes." In light of the surrounding facts and circumstances, the actions of the deputies with regard to handcuffing Mr. Garrison were objectively reasonable and cannot be found to amount to a use of excessive force.  *Cf. Fundiller v. City of Cooper City*, 777 F.2d 1436, 1438, 1441 (11th Cir. 1985)(finding "question is close" in reversing dismissal of substantive due process claim of use of excessive force where undercover agent suddenly, without provocation or warning, shot plaintiff five times; other officers did not render aid but dragged him out of car, shackled his hands behind him,

22

exacerbating one wound, stated they hoped he would bleed to death and shouted obscenities at him while he lay face down on ground).

## 2. Unreasonable Search

Defendants move for summary judgment on Plaintiff's claim that the search of 2619 Quincy violated her Fourth Amendment rights. (City's Motion No. VII; County's Supplemental Motion.) Plaintiff maintains that Defendants exceeded the permissible scope of a protective sweep of the residence by moving furniture in the living room and searching the drawers in her bedroom and the bathroom cabinet.

A protective sweep is "a quick and limited search of premises, . . . narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 326 (1990). It is conducted incident to an arrest to protect the safety of police officers and others. *Id.* In *Buie*, the Supreme Court held that:

> as an incident to the arrest the officers [can], as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, . . . there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the scene.

*Id.* at 334.

Although Plaintiff contends that moving furniture in the living room exceeds the scope of a protective sweep, the Court does not agree. Mr. Garrison had just threatened the officers by pointing a loaded gun at them. The officers had no idea who was present at 2619 Quincy; the dangerous suspects who they believed were at 2615 Quincy were not found during the execution of the search warrant there and it was not unreasonable, considering Mr. Garrison's actions, for the

officers to believe they might be at 2619 Quincy. Therefore, it was prudent of them to investigate the possible presence of other armed and dangerous persons in the vicinity. *See United States v. Tisdale*, 921 F.2d 1095, 1097 (10th Cir. 1990). Moving furniture to ascertain whether persons are hiding behind it is certainly within the ambit of such a search and Plaintiff has offered no evidence as to what furniture was moved or that Defendants moved furniture for any other purpose.

The search of Mrs. Garrison's bedroom drawers and bathroom cupboard, of course, cannot be justified on grounds of a protective sweep for dangerous persons. This search, however, is valid considering the exigencies of the situation present under the circumstances of this case. *See Warden v. Hayden*, 387 U.S. 294, 298-99 (1967)(necessity for speedy investigation to protect police officers' lives or lives of others justified warrantless entry and search for persons and weapons to insure suspect was only one present and that police had control of all weapons which could be used against them or to effect escape).

Although Plaintiff argues that Deputy Lucero had no reasonable suspicion that Plaintiff posed any danger at all to Defendants, the Court cannot agree. Mrs. Garrison remained in her bedroom and made use of the adjacent bathroom. Mr. Garrison had just aimed a gun at Defendants and a gun in Mrs. Garrison's hand would have posed no less danger to them. Therefore, the limited search for weapons in the drawers and cupboard in these areas to which Mrs. Garrison was given access did not violate her rights. *See United States v. Hernandez*, 941 F.2d 133, 135-38 (2d Cir. 1991)(quick search for weapons in area around bed where officer intended to place non-suspect, handcuffed female, including drawers next to bed and between mattress box and spring, justified to neutralize threat of physical harm)(citing and discussing *Terry*, 392 U.S. 1; *Michigan v. Long*, 463 U.S. 1032 (1983); and *Buie*, 494 U.S. 325).

### 3. Unreasonable Seizure of Mrs. Garrison

Defendants move for summary judgment on Plaintiff's unreasonable seizure claims. Mrs. Garrison asserts that Defendants seized and detained her without reasonable suspicion, in violation of her Fourth Amendment rights. Specifically, she claims Defendants exceeded any community caretaking function and acted unreasonably in following her around, watching her use the toilet, and refusing to tell her what had happened to her husband and allowing her to go to him.

Law enforcement officers have occasion to seize a person for a variety of reasons, some of which have nothing to do with a desire to prosecute for crime. *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993)(quoting *Terry*, 392 U.S. at 13). "Indeed, police officers are not only permitted, but expected, to exercise . . . 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *Id.* (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). Such purposes include seizures to "ensure the safety of the public and/or the individual." *Id.* Whether such a seizure is reasonable under the Fourth Amendment first "depends upon whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her 'community caretaking function' and the individual's interest in being free from arbitrary government interference." *Id.*

The second prong of the reasonableness inquiry requires a court to determine "whether the officer's action is 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* at 1562 (quoting *Terry*, 392 U.S. at 20). The focus is on "whether the facts available to the officer would 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Id.* (quoting *Terry*, 392 U.S. at 21-22.) Such evaluation is to be guided by

"common sense and ordinary human experience," *id.* (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)), and while the officer is not required to use the least intrusive means during the course of the detention, the Court must determine whether "failure to use less intrusive means was unreasonable," *id.* at 1562-62 (citing *Sharpe*, 470 U.S. at 686-87).

Officers encountered Mrs. Garrison while conducting their protective sweep of 2619 Quincy after the shooting of Mr. Garrison. As discussed above, it was reasonable for them, in the interests of safety, to search the premises for anyone posing a danger. Initial detention of anyone found, including Mrs. Garrison, likewise was reasonable. Mrs. Garrison, however, was detained for about one hour while authorities contacted and awaited the arrival of her son. Given her physical condition, the nature of the events that had just transpired, and the needs of the police in securing and investigating the crime scene, Defendants had more than sufficient factual basis to exercise their community caretaking functions over Mrs. Garrison. Additionally, balancing the governmental interests at stake and Mrs. Garrison's right to be free from interference finds the former vastly outweighing the latter. Indeed, it is clear that Mrs. Garrison in all likelihood was unable to care for herself. Thus, Defendants detention of Mrs. Garrison must be found to have been justified at its inception and justified in its length.

Mrs. Garrison, however, complains of the degree of interference she experienced: Deputies Eldredge and Lucero were always present, watched her use the toilet in her bathroom, and would not answer her questions as to what was happening. Considering the circumstances of this case, that the deputies stayed with Mrs. Garrison until her son arrived certainly falls within the realm of common sense. Additionally, under the circumstances, the Court cannot find that the deputies' failure to tell Mrs. Garrison what had happened or to allow her to go to her husband was inappropriate.

Furthermore, while their act of watching her use the toilet was certainly highly intrusive, it too was reasonably related in scope to facts initially justifying Mrs. Garrison's detention, the safety of the officers. Until officers could search the areas immediately available to Mrs. Garrison for weapons, it was reasonable of them to keep her under constant surveillance. Just as the search of the bathroom cupboard and bedroom drawers was justified, so, too, was the act of keeping Mrs. Garrison under watch until the search could be completed. As Defendants maintain, anyone, even the elderly and infirm, should be considered a threat if he or she has access to a gun. Therefore, as Mrs. Garrison has not stated a violation of a constitutional right, Defendants are entitled to qualified immunity.

**4. Section 1983 Claims Against APD Radio Dispatchers and 911 Operators**

Defendant APD Radio Dispatchers Baca, Patrick, and Marquez and 911 Operator Duran move for summary judgment on the § 1983 claim. (City's Motion No. VI.) Mr. Duran took Mr. Garrison's call to "911." The computers were down when the call came in, so Mr. Duran was unable to enter the information he gathered and send it to a dispatcher. Instead, Mr. Duran stood up and said that somebody had a gun, there were several subjects outside, and it was on Quincy, thus inquiring if any of the dispatchers present knew of a police operation on Quincy. Ms. Marquez, who was sitting right on front of Mr. Duran, turned around and told him that there was a possible SWAT call on Quincy, but she didn't know if it was his address. Mr. Duran looked at Ms. Marquez, but did not answer her as he was still on the call.

Plaintiff argues that the dispatchers and operators personally participated in the constitution deprivations she alleges because such deprivations would not have occurred but for their conscious withholding of information from Mr. Garrison: that despite knowing of the overwhelming likelihood that the people Mr. Garrison called about were police officers, Mr. Duran did not tell this to Mr.

Garrison. She also maintains that these Defendants acted unreasonably in acquiescing to Mr. Garrison when he said he had a gun and intended to go to the back door and not telling him to remain in his house and put down the gun.

As the Court has already determined that the officers on the scene at Quincy are entitled to summary judgment on each of Plaintiff's constitutional claims, the same must be held with regard to the APD dispatchers and 911 operators. Additionally, these Defendants acts and/or omissions in no way meet the requisite level of reckless or deliberate conduct necessary to sustain a § 1983 claim. *See Sevier*, 60 F.3d at 699 & n.7.

### 5. Supervisory Liability, Official Capacity Liability, and Conspiracy

Having found Defendants entitled to summary judgment on Plaintiff's constitutional claims, the Court also will grant County Defendants summary judgment on her supervisory liability, official capacity liability, and conspiracy claims, (County's Motion, County's Supplemental Motion). *See Thompson*, 58 F.3d at 1517. The Court also notes that there is no evidence of any affirmative link between Sheriff Bowdich, Captain Linthicum, or Captain Stebleton and the BCSO deputies who allegedly violated Plaintiff's constitutional rights. *See Woodward v. Worland*, 977 F.2d 1392, 1400 (10th Cir. 1992). Additionally, there is absolutely no evidence of any failure to take action, train, or supervise or longstanding custom, practice, or policy of deliberate indifference by the County Defendants regarding violations of the constitutional rights of persons with whom their subordinates came into contact. Finally, there is also no evidence of any conspiracy in this case.

**State Law Claims**

**1. Negligence of APD Dispatchers and 911 Operators**

City Defendants move for summary judgment on the state tort claims asserted against the APD radio dispatchers and 911 operators. (City's Motion No. VI.) They maintain that these individuals are immune from suit. The Court agrees.

Pursuant to the New Mexico Tort Claims Act, "any public employee while acting with the scope of duty [is] granted immunity from liability for any tort except as waived by Sections 41-4-5 through 41-4-12 NMSA 1978. N.M. Stat Ann. § 41-4-4(A)(Michie 1996 Repl. Pamph.). This general grant of immunity is waived for certain enumerated torts committed by law enforcement officers:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

*Id.* § 41-4-12. "Law enforcement officer" is defined as

> any full-time salaried public employee of a governmental entity whose *principal duties* under law are to hold in custody any person accused of a criminal offense, *to maintain public order* or to make arrests for crimes, or members of the national guard when called to active duty by the governor.

*Id.* § 41-4-3(D)(emphasis added).

Defendants Baca, Patrick, Marquez, and Duran contend that they are not "law enforcement officers" within the meaning of the Tort Claims Act. Plaintiff responds that their principal duties fall within the statutory element of "maintaining public order." Neither party has alerted the Court to any New Mexico case that addresses whether police dispatchers or 911 operators are law

29

enforcement officers under the Act, and the Court has found none, but other case law is informative.

Whether an individual is a law enforcement officer for purposes of the Tort Claims Act is "determined by examining 'the character of the principal duties involved, those duties to which employees devote a majority of their time.'" *Weinstein v. City of Santa Fe*, 121 N.M. 646, 650, 916 P.2d 1313, 1317 (1996)(quoting *Anchondo v. Corrections Dep't*, 100 N.M. 108, 110, 666 P.2d 1255, 1257 (1983)). Determination of whether an individual's principal duties are "to maintain public order" requires "review of the employee's day-to-day duties, responsibilities, and activities" which are then "measured against the admittedly amorphous standard of the duties and activities traditionally performed by law enforcement officers." *Coyazo v. State*, 120 N.M. 47, 50, 897 P.2d 234, 237 (Ct. App. 1995). This determination is "fact specific, but informed by a practical, functional approach as to what law enforcement entails today." *Id.* at 51, 897 P.2d at 238.

The Human Services Department's job classification and compensation descriptions for APD radio dispatchers and 911 operators respectively provide:

General Statement of Duties

[Police Dispatcher]: Operate a communications console consisting of Computer Aided Dispatch system, Enhanced 9-1-1 and two-way radio systems. Coordinate and dispatch Police Officers in response to emergency and non-emergency calls for service. Coordinate and monitor the ongoing activities of field personnel. Operate the National Crime Information center (NCIC) and Albuquerque Computerized Telecom Information Orientation Network (ACTION) and teletype machine when necessary.

[9-1-1 Operator]: Receive, evaluate, prioritize and relay 9-1-1 emergency calls for medical, police and fire services which require dispatch. Receive, evaluate, prioritize and relay non-emergency and ring-down lines.

(Mem. Supp. City's Motion No. VI (Docket No. 75) Ex. A at 2, 4.)

Additionally, the "Typical Duties and Responsibilities" listed for each job are:

> [Police Dispatcher]
> 1. Receive requests for emergency and non-emergency police assistance from 9-1-1 operator. Prioritize and dispatch appropriate and available officer(s) via voice transmission and/or Computer Aided Dispatch (CAD) system.
> 2. Receive, monitor and update information via radio transmission and/or CAD system concerning status and activities of officers.
> 3. Relay applicable NCIC, teletype and other essential information to officers concerning ongoing activities.
> 4. Answer and respond to phone calls from internal and external sources and service channel requests as well as inquiries by CADs/radio from Police Officers.
> 5. Perform the same duties as the 9-1-1 Operators and operate the NCIC and ACTION terminals and teletype machines as needed.
> 6. Maintain complete logs of calls on the service channel.
> 7. Perform other duties as they relate to the job.
>
> [9-1-1 Operator]
> 1. Assume control of callers to 9-1-1, determine the nature of the emergency, obtain detailed and accurate information from the caller and relay the emergency information to the appropriate dispatcher.
> 2. Verify origination of emergency calls.
> 3. Receive, evaluate, prioritize and relay non-emergency and ring-down lines.
> 4. Maintain logs of runaways and abandoned vehicles.
> 5. Operate special hearing impaired telephones (TTY) to receive incoming calls for services.
> 6. Monitor special alarms tied into the 9-1-1 system.
> 7. May relay official and non-official messages to officers in the field.
> 8. Perform other duties as they relate to the job.

(*Id.*)

The comparison to be drawn then is " between the primary activities of the public employee in question and the normal commonplace activities of, for example a police officer on patrol." *Coyazo*, 120 N.M. at 50, 897 P.2d at 237. Applying this practical approach, it is clear that APD radio dispatchers and 911 operators are not engaged in the same activities as the officer on patrol. Rather, their duties are more analogous to those of secretaries or administrative assistants and as such, they are not "law enforcement officers." *See Weinstein*, 121 N.M. at 650 n.2, 916 P.2d at 1317

31

n.2 ("[P]olice secretaries and couriers would not be considered law enforcement officers under the Act because their principal duties do not include making arrests or keeping the peace."). Therefore, Defendants' Motion will be granted.

## 2. Assault and Battery

Officer Terry moves for summary judgement on Plaintiff's assault and battery claim. (City's Motion No. VI.) Under New Mexico law, for there to be a tortious assault, there must be an act, threat, or some other menacing conduct which causes another person to reasonably believe that he or she is in danger of receiving an immediate battery. *Baca v. Velez*, 114 N.M. 13, 15, 833 P.2d 1194, 1196 (Ct. App. 1992). Under the facts of this case, there is no way the Court can find that Mr. Garrison could "reasonably" believe that he was in danger of an immediate battery. During his first encounter with the officers, not one of them threatened him by word, action, or other menacing conduct. No officer touched Mr. Garrison, approached him, or entered his backyard. The officers identified themselves and their mission and told him to return to his house, which he did. No one followed him or interfered with him while he recrossed his backyard and none of the officers had any contact with him while he remained in his house. The APD and BCSO officers were lawfully executing a search warrant at 2615 Quincy and none of their conduct was directed at Mr. Garrison, except to order him to return to his house at 2619 Quincy. Additionally, Officer Terry did not even participate in the initial encounter with Mr. Garrison. Thus, his Motion must be granted as to the assault claim.

As to the battery claim, Officer Terry argues that he is entitled to summary judgment on grounds that he acted in good faith and with probable cause. The New Mexico Supreme Court has recognized that

32

> [o]fficers, within reasonable limits, are the judges of the force necessary to enable them to . . . preserve the peace. When acting in good faith, the courts will afford them the utmost protection and they will recognize the fact that emergencies arise when the officer cannot be expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigations in court.

*Mead v. O'Connor*, 66 N.M. 170, 173, 344 P.2d 478, 479-80 (1959). When Mr. Garrison reappeared at his back door and aimed his gun at Defendants, he committed the crime of aggravated assault. Perceiving an immediate threat of serious physical harm to himself and the other officers present, Officer Terry reacted in an objectively reasonable manner by shooting Mr. Garrison.

Although Plaintiff maintains that Defendants provoked Mr. Garrison and were somehow responsible for causing him to reappear with his gun and threaten them from his back door, this argument is unsupported by the facts or law. Plaintiff does not and cannot argue that Defendants had any duty to inform Mr. Garrison of their intention to serve a search warrant on his rental property. Additionally, Mr. Garrison had no legal right to point his gun at the officers or to use force in an attempt to interfere with their execution of the search warrant. *State v. Johnson*, 124 N.M. 647, 654, 954 P.2d 79, 86 (Ct. App. 1997)("[A] homicide by a private citizen . . . is justifiable only if 'necessarily committed . . . by lawful ways and means,' meaning that deadly force in the apprehension of suspected felons is justifiable only when the citizen has probable cause to believe he or she is threatened with serious bodily harm or the use of deadly force.")(quoting N.M. Stat. Ann. § 30-2-7(C)); *Brown v. Martinez*, 68 N.M. 271, 280, 361 P.2d 152, 159 (1961)("[S]ince the law has always placed a higher value upon human safety than upon mere rights in property, it is the accepted rule that there is no privilege to use any force calculated to cause death or serious bodily injury where only the property is threatened."). Therefore, Officer Terry's Motion also will be granted as to the battery claim.

## 3. False Imprisonment

City Defendants move for summary judgment on Mrs. Garrison's false imprisonment claim. (City's Motion No. VII.) False imprisonment involves "unlawful interference with the personal liberty or freedom of locomotion of another." *Martinez v. Sears, Roebuck & Co.*, 81 N.M. 371, 373, 467 P.2d 37, 39 (Ct. App. 1970). Confinement in jail or custody is not required, and the requisite restraint

> may arise out of words, acts, gestures or similar means which induce reasonable apprehension that force will be used if the plaintiff does not submit and it is sufficient if they operate upon the will of the person threatened and result in a reasonable fear of personal difficulty or personal injuries.

*Id.* Reasonable cause, however, is a defense to a claim of false imprisonment. *Diaz v. Lockheed Elecs.*, 95 N.M. 28, 30, 618 P.2d 372, 374 (Ct. App. 1980)(citing and discussing *Stienbaugh v. Payless Drug Store, Inc.*, 75 N.M. 118, 401 P.2d 104 (1965)).

Defendants maintain that they had reasonable cause to restrain Mrs. Garrison and the Court agrees. As discussed in regard to Mrs. Garrison's unreasonable seizure claim, the officers, as a matter of law, had reasonable cause to restrain her for their and her protection, to meet their community caretaking responsibilities, and to allow the investigation into the shooting to proceed. Thus, summary judgment will be granted as to Mrs. Garrison's false imprisonment claim.

**IT IS HEREBY ORDERED** that City Defendants' Motion for Partial Summary Judgment No. III: Qualified Immunity for Officer Terry Against Fourth Amendment Excessive Force Claim, (Docket No. 30), filed July 17, 1997, is **GRANTED**.

**IT IS FURTHER ORDERED THAT** Bernalillo County Defendants' Motion for Summary Judgment on Plaintiff's Civil Rights Claims (Docket No. 69), filed October 24, 1997, is **GRANTED**

**IN PART** as to the unlawful seizure claims regarding Mr. and Mrs. Garrison, official capacity liability, supervisory liability, and conspiracy.

**IT IS FURTHER ORDERED** that City Defendants' Motion for Partial Summary Judgment No. VI: Supervisory Liability Claim Against Chief Polisar, Lt. DeBuck, and Lt. Schaffer, Assault and Battery Claim Against Officer Terry, § 1983 Conspiracy Claim, and § 1983 and State Tort Claims Against the APD Radio Dispatchers and 911 Operators (Docket No. 74), filed November 5, 1997, is **GRANTED IN PART** as to the assault and battery claim against Officer Terry, and the § 1983 and state law claims against the APD radio dispatchers and 911 Operators.

**IT IS FURTHER ORDERED** that City Defendants' Motion for Partial Summary Judgment No. VII: Qualified Immunity for Defendant Officers Against Fourth Amendment "Unlawful Search and Seizure" and False Imprisonment Claims (Docket No. 85), filed January 8, 1998, is **GRANTED**.

**IT IS FURTHER ORDERED** that County Defendants' Supplemental Motion for Summary Judgment on Plaintiffs' Civil Rights Claims (Docket No. 108), filed August 5, 1998, is **GRANTED**.

_____

**UNITED STATES DISTRICT JUDGE**

35